**CANADIAN GULF LINES, INC.**

v.

**TRITON INTERNATIONAL CARRIERS, LTD.**

Civ. No. B–75–285.

United States District Court, D. Connecticut.

Dec. 8, 1976.

Richard L. Albrecht, Bridgeport, Conn., Thomas E. Stiles, New York City, for plaintiff.

Jacob D. Zeldes, Bridgeport, Conn., for defendant.

RULING ON MOTIONS

NEWMAN, District Judge.

This series of related motions presents close questions concerning the proper action

a court should take to protect an attorney's former client when the attorney's investigatory efforts on behalf of a present client lead him to his former client's doorstep. In this case the plaintiff's attorney after investigation discovered the existence of certain assets in the hands of the garnishee alleged to be due and owing to the defendant. After garnishment the garnishee moved to disqualify plaintiff's counsel, to restrict the use of information about the garnishee collected by plaintiff's counsel, to strike affidavits, to vacate garnishment and discharge the garnishee, to stay proceedings on discovery motions, and to grant costs and other relief. The basis for the motions is the assertion that the garnishee was at one time a client of plaintiff's attorney's firm.

The differing versions of the facts must be stated in some detail. The tale begins in August of 1974, when Bengt Sundstrom came to the office of Renato C. Giallorenzi, Esq., an attorney in New York City. Sundstrom, a Swedish citizen who had recently come to this country on matters relating to his shipping business, needed legal advice and assistance in the formation of a steamship corporation. He had been referred to the Giallorenzi firm by another admiralty firm in New York, Freehill, Hogan & Mahar. After several meetings with Sundstrom, Attorney Giallorenzi caused to be incorporated under the laws of the state of New York a corporation called Swede International Shipping Corp. (Swede-N.Y.). The corporation never began operations, as Sundstrom decided to use another corporation, Swede International Shipping Corporation (Swede), organized by other attorneys at his request under the laws of the state of Delaware.

Some time later Thomas Stiles, now Renato Giallorenzi's partner, took on the representation of plaintiff Canadian Gulf Lines, Inc. in its suit against defendant Triton International Carriers, Ltd. Triton by this time was insolvent, but Stiles, after extensive investigatory efforts including making a trip to Rotterdam and retaining foreign counsel, discovered the existence of certain assets in the hands of Swede alleged to be due and owing to Triton. Garnishee process against Swede issued on September 22, 1975. Swede then moved to disqualify Giallorenzi & Stiles as counsel for the plaintiff Canadian Gulf and for other relief as specified. The disqualification motion and related motions were based on the theory that Giallorenzi's firm had obtained or could have obtained confidential communications from Sundstrom in connection with the formation of Swede-N.Y. and that their undertaking of any representation exploiting these communications or otherwise taking positions adverse to Sundstrom or Swede was improper and unethical.[1]

The nature of the attorney-client relationship between Giallorenzi and Sundstrom is sharply in dispute. Giallorenzi's version is that Sundstrom was primarily a client of Freehill, Hogan & Mahar. William Juska of the Freehill firm referred Sundstrom to Giallorenzi because Freehill was unable to give Sundstrom the immediate assistance he required during the late summer when Mahar, who would otherwise have handled the matter, was on vacation. Giallorenzi says he told both Juska and Sundstrom that he took the case as an accommodation to the Freehill firm with which he had a longstanding relationship, and that he would perform the limited service of forming a corporation for Sundstrom but would consider Sundstrom to be Freehill's client for all other purposes. He intended to charge Sundstrom only for out-of-pocket disbursements, with the understanding that the Freehill firm could bill Sundstrom for the services rendered if it wished. He states that he met with Sundstrom for a few brief meetings culminating in the filing of a certificate of incorporation for Swede-N.Y. with the New York Secretary of State. He used his standard form certificate of incorporation which he had developed and used

---

1. Swede itself, the present garnishee and moving party, has never been a client of Giallorenzi & Stiles. It was organized under Delaware law by a different firm of attorneys. But Sundstrom, who was Giallorenzi's client, is the president and sole shareholder of Swede. Clearly any action adversely affecting Swede will have a significant adverse impact on Sundstrom.

for the incorporation of numerous shipping corporations over the years. The only information he requires from a client to complete the form once he knows the business is shipping is the name of the corporation and the number and par value of shares. As far as he was concerned, the limited nature of the service he would be performing as well as the fee arrangement was made absolutely clear to all from the start, and nothing developed during the course of the relationship to expand his limited role.

Sundstrom's version is very different. In his affidavit in support of the motions he states:

> 6. During the course of my meetings and telephone calls with Mr. Giallorenzi and Mr. Stiles, I discussed with them, in detail, the various business arrangements between Triton and Swede including, for example, commission and compensation arrangements, as to which plaintiff now seeks formal discovery. In this connection, I made available to Mr. Giallorenzi, among other things, items of correspondence with Triton which, I believe, have been utilized against Swede by plaintiff Canadian Gulf Lines, Inc., which Messrs. Giallorenzi and Stiles now represent as counsel.

Giallorenzi categorically denies that he ever saw any such correspondence or that he ever heard anything about the arrangements between Triton and Swede.

Plaintiff takes the position that Giallorenzi acted as a mere scrivener for Sundstrom and Swede-N.Y. and that there is no conflict between this role and the firm's later representation of Canadian Gulf in the action against Triton and Swede. The position of Swede, on the other hand, is first that the existence of a "substantial relationship" between Giallorenzi's original representation of Sundstrom and the firm's later adverse representation requires disqualification without any inquiry into the exact nature of the confidences communicated, and further that such an inquiry would show in any event that Sundstrom communicated crucial confidential information to Giallorenzi, which the firm later

used against Sundstrom and his Delaware corporation.

### Motion to Disqualify

The law in this Circuit is clear that "where any substantial relationship can be shown between the subject matter of a former representation and that of a subsequent adverse representation, the latter will be prohibited." *T.C. Theatre Corp. v. Warner Bros. Pictures,* 113 F. Supp. 265, 268 (S.D.N.Y.1953) (Weinfeld, J.). See *Cinema 5, Ltd. v. Cinerama, Inc.,* 528 F.2d 1384 (2d Cir. 1976); *International Electronics Corp. v. Flanzer,* 527 F.2d 1288 (2d Cir. 1975); *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.,* 518 F.2d 751 (2d Cir. 1975); *General Motors Corp. v. City of New York,* 501 F.2d 639 (2d Cir. 1974); *Emle Industries, Inc. v. Patentex,* 478 F.2d 562 (2d Cir. 1973). The rule promotes the policy of encouraging communications from clients to attorneys by assuring clients that their attorneys will not be able to take advantage in a subsequent adverse representation of any confidences the clients may have divulged if the subject matters of the two representations are sufficiently related to make the risk of use of previously disclosed confidences a real one. Our Circuit has approved Judge Weinfeld's approach in the *T.C. Theatre Corp.* case of declining to inquire whether actual confidences were ever disclosed in the first representation. See *Emle Industries, Inc. v. Patentex, Inc., supra; Motor Mart, Inc. v. Saab Motors, Inc.,* 359 F.Supp. 156 (S.D.N.Y.1973). The theory behind presuming confidential disclosures once a substantial relationship is found is that any rule requiring proof of actual disclosures would itself undermine the policy of encouraging free communication by forcing the client to divulge his confidences in court as part of his proof. Thus under the substantial relationship test as applied in this Circuit,

> the former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney pre-

viously represented him, the former client. The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into their nature and extent. Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained. *T.C. Theatre Corp. v. Warner Bros. Pictures, supra,* at 268–69.

Though the legal rule is clear, the subtleties of applying it in practice can be more elusive. It happens that in most of the reported cases courts have found either the existence or the absence of a substantial relationship to be "patently clear." See *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., supra.* Unfortunately, however, the present case is not marked by such overwhelming clarity. The garnishee argues that both the present and the former representation involve the identical issue of the connection between Sundstrom's interests and Triton, while the plaintiff argues forcefully that the mere act of submitting a boilerplate certificate of incorporation to the New York Secretary of State can have no relationship, let alone a substantial one, to the complex business dealings involved in the present litigation.[2] It is tempting to try to determine what actually happened in Attorney Giallorenzi's office, for if it could be conclusively established that Giallorenzi learned about Triton from Sundstrom, the impropriety of continued representation would be clear, while if it could be conclusively established that Sundstrom never mentioned Triton, the case for finding impropriety would become far more tenuous.

Under the *T.C. Theatre* approach as approved by our Circuit in *Emle Industries, Inc. v. Patentex, Inc., supra,* an inquiry into the exact words used or documents shown by Sundstrom to Giallorenzi would be precluded or at least discouraged. The recent *Silver Chrysler Plymouth* case, however, makes clear that the inference that confidential information was transmitted can be a rebuttable one. 518 F.2d 751, 754. See also *Laskey Bros. of W. Va., Inc. v. Warner Bros. Pictures,* 224 F.2d 824, 827 (2d Cir. 1955), *cert. denied,* 350 U.S. 932, 76 S.Ct. 300, 100 L.Ed. 814 (1956). In the present case I am persuaded that if Giallorenzi ever heard mention of the Triton name, he paid no attention to it and certainly had no reason to remember it. It has recently been observed that "courts may take judicial notice of the manner in which law firms operate in order to avoid the harsh application of inflexible standards." *Oken v. C & S Securities, Inc.,* 73 Civ. 2712 (S.D. N.Y. Feb. 25, 1976). See also *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., supra,* at 756–57. While Sundstrom attaches importance to the fact that Giallorenzi was responsible for specification of the corporate purposes used in Swede-N. Y.'s certificate of incorporation, he may not have been aware that Giallorenzi had developed his standard form clauses over the course of 35 years of law practice for routine use in the formation of a shipping corporation. Giallorenzi's testimony, as well as judicial notice of the usual method of forming corporations, supports Giallorenzi's position that there was no reason whatever for him to have been aware of Sundstrom's relationship to Triton.

But while I believe that Giallorenzi has rebutted the inference that he "received" confidential information in the sense of having cognitively processed and retained

---

**2.** One way to interpret plaintiff's argument is that Giallorenzi's functions were essentially those of a scrivener rather than an attorney and that scrupulous protection of the attorney-client privilege is therefore unnecessary. This would be an erroneous view of the law. As our Circuit has recently reiterated, for the purposes of applying the substantial relationship test to protect a former client's confidences, there is no distinction "between legal work and non-legal work, or between a requisite minimum of legal advice and mere peripheral legal participation." *NCK Organization Ltd. v. Bregman,* 542 F.2d 128 (2d Cir. 1976). "[C]lients . . . are entitled to expect that their lawyers will act as they are supposed to act, without quibble as to what particular services may have been technically legal services." *Cord v. Smith,* 338 F.2d 516, 524 (9th Cir. 1964).

the information, I am concerned over the fact that Sundstrom obviously thinks he communicated the confidences to Giallorenzi—unless he is deliberately committing perjury, which I am reluctant to conclude. He claims to have a distinct recollection of having shown letters about the Triton business to Giallorenzi, and since his visit to a lawyer was undoubtedly more memorable to him than to the attorney, who by his own testimony forms such corporations routinely, there is some basis for preferring his recollection to Giallorenzi's. Certainly the opportunity was there for him to have made such a disclosure. If he did discuss Triton with Giallorenzi, it is conceivable that even though Giallorenzi has not recalled the discussion, something in the future might jog his memory of what occurred. The admonition of Canon 9 of the Code of Professional Responsibility that a lawyer should avoid even the appearance of impropriety justifies resolving the issue in Sundstrom's favor, even if, as appears likely, there has been no actual wrongdoing. I will grant the motion to disqualify the firm of Giallorenzi & Stiles from acting further as counsel to plaintiff in matters involving Giallorenzi's former client even though I find that there is no reasonable likelihood of actual prejudice to Sundstrom or Swede. My reason for granting the motion is to honor Sundstrom's valid expectations from a proper attorney-client relationship given his sworn statements that he did disclose confidences to Giallorenzi.[3] I emphasize, however, that I am convinced that no such confidences have ever been retained in the personal or institutional memories of the lawyers or the firm, and thus my treatment of the motions for remedial relief differs from my treatment of the motion to disqualify.[4]

*Remedial Motions*

The garnishee argues that in order to preclude the use against Swede or Sundstrom of matters disclosed in confidence, additional relief is necessary. It moves for an order that no information provided by the law firm of Giallorenzi & Stiles or by either Giallorenzi or Stiles be utilized in this action; that the affidavits executed by Thomas Stiles be stricken; that the garnishment be vacated and Swede be discharged as garnishee; that proceedings on discovery motions be stayed; and that Swede be granted costs and further relief. It contends that without this additional relief, Swede and Sundstrom could be severely prejudiced by the use against them of information divulged in confidence.

It is important to state what would be at stake if the remedial motions were granted. From all the evidence submitted to the Court, it appears that to grant the garnishee's motions in full would not merely protect the garnishee from potential prejudice growing out of the former attorney-client relationship, but would probably mean that no attorney would ever be able to recover from the underlying defendant or secure a garnishment against the present garnishee. The amount at stake is somewhat over $200,000. The enormous hardship that would be inflicted on an innocent plaintiff by granting these motions is clear from an examination of the information involved and how it was acquired.

According to the allegations of the complaint, in August of 1975 the defendant Triton defaulted on a charter hire payment due and owing to the plaintiff Canadian Gulf, to the plaintiff's damage as more fully set out in the complaint. Canadian Gulf retained the firm of Giallorenzi & Stiles to sue Triton. At the time the firm took on the case there was no reason for Giallorenzi or Stiles or anyone else associated with the firm to decline the representation. Triton

---

**3.** This type of concrete proof differs from the conclusory allegations of disclosure made by the moving party in *Silver Chrysler Plymouth. See* 518 F.2d at 757 n. 8.

**4.** Notwithstanding Sundstrom's mention in his affidavit (quoted at p. 693, *supra*) of meetings

with Stiles, the testimony establishes that these meetings amounted to no more than greetings in the elevator and brief phone conversations to leave messages for Giallorenzi. Thus there is no cause for concern that any confidential disclosures were ever made to Stiles.

had never been a client of the firm. There is no mention of Triton in the firm's file on the formation of Swede-N.Y. Giallorenzi testified that the first time he ever heard of Triton was when the Canadian Gulf matter was referred to his office. If Sundstrom ever did mention Triton to Giallorenzi, Giallorenzi had no reason whatever to remember the name. As far as he was concerned, his only involvement with Sundstrom was to submit the boilerplate certificate of incorporation to the New York Secretary of State. I am convinced that he had no actual awareness of Triton or of Triton's relationship to Sundstrom or Swede either at the time of his representation of Swede-N.Y. or at any time until after his firm commenced work on the present lawsuit. Consequently his firm's undertaking of the representation of Canadian Gulf against Triton was entirely proper.

It quickly became clear that Triton was insolvent. Stiles immediately began a search for assets to secure or satisfy the debt due to the plaintiff. Canadian Gulf had just learned that the guarantor of the Charter Party, Blaesbjerg Scheepvaart B.V., had been sold to Mercury Scheepvaart B.V., a corporation in Rotterdam. To check on the guarantor's financial ability to pay, Stiles began correspondence with attorneys and other persons in Europe. He flew to Rotterdam and met for two days with Gabriel Rybier, the major shareholder in Triton, and also with other persons in the Netherlands. Based on his conversations with Rybier and documents Rybier showed him, Stiles instituted the present action. His garnishment of Swede grew out of information from Rybier that Swede was holding large sums of money belonging to Triton. His affidavits in the present case including his affidavit in support of the garnishment are entirely based on his personal investigation including the information uncovered on his trip to Rotterdam. He states that his belief concerning the corporate relationships of Triton, Swede, and other connected entities is based upon "the Charter Party, my discussions with Mr. Rybier and documents I was shown." Affidavit in Support of Motion to Compel Discovery at ¶ 17. I am fully persuaded that Stiles' discovery of the relationship between Triton and Swede was made entirely independently of any information revealed by Sundstrom to Giallorenzi.

Further, Stiles has filed an affidavit stating:

> As to the possibility of reconstructing the information and the material that I obtained in Rotterdam, we believe it will be very difficult, if not impossible, to accomplish. Because of this, the plaintiff would be severely prejudiced and we believe the garnishee's purpose in making this motion, i. e., to frustrate the plaintiff's garnishment action, would be accomplished if our firm was disqualified. We do not know where Mr. Rybier, or other employees of MERCURY, TRITON, et al., are now located. We have been in contact with our correspondent attorneys in The Netherlands . . . . They further informed us that they could not state that the documents were available at this time.

Thus it appears from all the evidence that neither Giallorenzi nor Stiles had any actual awareness of the relationship between Swede and Triton. I am fully convinced that it was only after lengthy and expensive investigatory efforts wholly independent of their former representation that they uncovered the relationship. I am also convinced that to deny Canadian Gulf the benefit of those investigatory efforts would seriously prejudice Canadian Gulf. The prejudice involved could be more than just a surmountable hardship, since the affidavits indicate that the information collected by Stiles on his trip to Rotterdam may be essentially unavailable at this time or in the future.

The granting of the motion to disqualify is justified largely by a concern to avoid even the appearance of impropriety. The need to enforce Canon 9 is lessened where the relief sought is more drastic than disqualification and would deprive the plaintiff of the results of its own counsel's completely proper and essentially unreproducible investigation. While it is true as a

general rule that the attorney-client privilege "is not nullified by the fact . . . that there are other available sources for such information, or by the fact that the lawyer received the same information from other sources," *Emle Industries, Inc. v. Patentex, Inc., supra,* at 572–73; *NCK Organization Ltd. v. Bregman, supra,* at 133, there is no corresponding rule that information legitimately obtained from other sources must be suppressed. The purpose of the canon is adequately served, and Sundstrom's interests adequately protected, by disqualifying Giallorenzi & Stiles from future adverse representation. Since no actual impropriety has been either committed or exploited, I see no need to enforce the canon against the appearance of impropriety so mechanically that an innocent plaintiff would lose a highly valuable garnishment that has not in fact been obtained by reason of the prior representation. Undoing the services already performed would be a harsh, excessive, and unwarranted penalty.

The motion to disqualify the law firm of Giallorenzi & Stiles is granted in part as follows: Renato Giallorenzi, Thomas Stiles, and the firm of Giallorenzi & Stiles are disqualified from acting as counsel to the plaintiff in pursuing the garnishment against Swede International Shipping Corporation. They may continue in their representation of Canadian Gulf Lines, Inc. against Triton International Carriers, Ltd. in any matter not involving Swede.

The motion to restrict the use of information provided by Giallorenzi & Stiles, or Giallorenzi, or Stiles, to plaintiff or plaintiff's counsel is denied.

The motion to strike the affidavits executed by Thomas Stiles is denied.

The motion to vacate process of garnishment and discharge the garnishee is denied.

The motion to stay proceedings on the discovery motions is denied.

The motion for costs and further relief is denied.